# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

| | |
|---|---|
| RXCROSSROADS 3PL LLC,<br><br>  Plaintiff,<br><br>v.<br><br>TODD ELLIOTT and BIO PHARMA LOGISTICS, LLC,<br><br>  Defendants. | Case No. 3:25-cv-107-DJH |

## COMPLAINT

RxCrossroads 3PL LLC ("RxCrossroads"), by and through its undersigned counsel, brings this Complaint against Defendants Todd Elliott ("Elliott") and Bio Pharma Logistics, LLC ("BPL").

## INTRODUCTION

1. Defendant Elliott was a Director of Operations in McKesson's third party logistics business, with responsibility for overseeing its blood plasma distribution services.[1] Defendant BPL is a direct competitor of McKesson 3PL in the blood plasma distribution market.

2. After several employees left McKesson 3PL for BPL in 2022 and 2023, and BPL sought to hire Elliott, McKesson 3PL sought to retain its senior leader with direct knowledge of the confidential information that made the business run. Toward that end, in 2023, McKesson 3PL offered Elliott a significantly enhanced compensation package, conditioned upon his entry into an

---

[1] Elliott was employed by Plaintiff RxCrossroads 3PL LLC, which is a subsidiary ultimately owned by McKesson Corporation that operates McKesson's third party logistics business, known as McKesson Third Party Logistics ("McKesson 3PL"). Included in McKesson 3PL is McKesson's plasma distribution business. Because the business is commonly known as, and holds itself out under the name "McKesson 3PL", this Complaint will refer to the business as McKesson 3PL.

agreement with reasonable post-employment restrictions. Those post-employment restrictions include a non-compete provision, which prohibits Elliott from joining a competitor of McKesson 3PL in the 12 months after his employment. Elliott agreed to that provision and received significantly enhanced compensation as a result.

3. At the end of 2024, Elliott advised McKesson 3PL that he had been approached by BPL about a senior role its blood plasma distribution services. At that time, McKesson reminded Elliott of his non-compete obligations and stated that the BPL would be considered competitive. Nevertheless, on February 11, 2025, Elliott notified McKesson that he was resigning to join BPL. Upon information and belief, the role Elliott accepted is overseeing BPL's blood plasma distribution offerings that compete directly with the same business he oversaw at McKesson 3PL.

4. After he provided notice of his resignation McKesson advised Elliott that his employment at BPL would be considered a breach of his agreement, and asked him to explain how that employment could be viewed as anything but a directly competitive role. McKesson also sent correspondence to BPL, advising it of Elliott's contractual obligations, stating that it would consider Elliott's role at BPL to be a violation of his agreement, and asking for an explanation as to how that role could be viewed as anything other than a breach of Elliott's agreement. Neither Elliott or BPL provided any explanation nor a substantive response.

5. On his last day at McKesson 3PL, February 21st, McKesson asked Elliott to confirm when he would be starting his new role at BPL. Elliott refused to answer or speak further with the McKesson representative. Upon information and belief, Elliott intends to begin working at BPL in the week of February 24, 2025.

6. To be clear, there are only a handful of competitors in the blood plasma distribution market. Elliott's post-employment restrictions are narrowly limited to just prohibit his work in a

role where he would have similar responsibilities that he performed in his last 18 months with McKesson 3PL, or a role in which the confidential information to which he had access at McKesson 3PL would be relevant. Those restrictions are designed to prevent what Elliott and BPL are threatening now: a senior employee with detailed knowledge of the confidential information that makes the McKesson 3PL organization run leaving to immediately join a direct competitor. The threatened harm to McKesson 3PL if Elliott joins BPL during his restricted period is irreparable.

7. Plaintiff now seeks injunctive relief from this Court to enforce its reasonable restrictions.

## PARTIES

8. Plaintiff is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of Pennsylvania. Plaintiff has one member, RxC Acquisition Company, which is a corporation incorporated in the State of Delaware and has its principal place of business in Pennsylvania.

9. Defendant Elliott is an individual residing in Burlington, Kentucky.

10. Defendant BPL is a limited liability company organized under the laws of the Commonwealth of Kentucky, with its principal place of business in Louisville, Kentucky. Upon information and belief, none of the members of BPL are citizens of Pennsylvania or Delaware.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenship of the parties, and because the amount in controversy in this matter exceeds $75,000.00, exclusive of interests and costs.

12. This Court has personal jurisdiction over Defendants pursuant to Kentucky law and the United States Constitution because Defendants are both citizens of Kentucky.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## FACTS COMMON TO ALL CLAIMS

*McKesson 3PL's Plasma Distribution Business and Elliott's Role*

14. McKesson is a global leader in the sale of medical and surgical supplies and equipment. McKesson's clients—which include everything from small family clinics to some of the nation's premier hospitals—rely on McKesson to help them effectively serve their patients by delivering insights, products, and services that make quality care more accessible and affordable.

15. McKesson has a number of specialty business segments, including McKesson 3PL. McKesson 3PL, through years of effort and millions of dollars in investment, has built a leading nationwide network for the distribution of plasma and plasma-derived products.

16. The distribution of human plasma and plasma-derived products is a highly-regulated, niche industry. Plasma and plasma-derived products must be delivered within strict timeframes, under tightly-regulated temperature controls, and in compliance with complicated layers of state and federal laws regarding the storage, transportation, and distribution of human-derived pharmaceutical products across state lines and even internationally. Plasma and plasma-derived products must be delivered in exacting quantities to hospitals and treatment centers, but those needs may change in a moment in response to emergencies. McKesson 3PL has developed a network of vendors, specialized warehouses, temperature-controlled shipping methods, and distribution networks to accommodate those demands and the needs of its customers.

17. Because of the nature of the work performed, and because of McKesson 3PL's substantial investment into developing its plasma distribution network, McKesson 3PL forms

4

long-standing relationships with its customers and vendors. As a result of that close relationship, McKesson 3PL acquires a wide range of confidential and trade secret information about its customers' product needs, preferences, delivery schedules, pricing, and service requirements. McKesson 3PL also acquires a wide range of confidential and trade secrets about its network of vendors, their capabilities and licensures, and their reliability, all of which are critical to McKesson 3PL's ability to generate and maintain its long-lasting customer relationships.

18. The information that McKesson 3PL compiles allows its employees to see precisely, with granular detail, which strategies are succeeding for specific customers and needs, which are not, and which vendors are best suited and appropriately licensed for distribution in certain areas. All of this information is highly valuable to McKesson 3PL and would provide any competitor with a detailed roadmap of what strategies to employ and where.

19. Elliott was formerly employed in McKesson's 3PL business for over 28 years, most recently as a Director of Operations.[2] As Director of Operations, Elliott was the leader at McKesson 3PL for its plasma business, with responsibility for directing the overall strategy of the plasma business across the entire country, and with particular responsibility for McKesson 3PL's warehouse located in Erlanger, Kentucky. That warehouse is McKesson 3PL's sole warehouse, and responsible for plasma shipments to and from the entire country. Elliott was also directly involved in negotiating agreements and setting prices for McKesson 3PL's vendors and customers nationwide. Beyond the blood plasma business, Elliott also had access to confidential information regarding McKesson 3PL's other business lines.

---

[2] RxCrossroads 3PL LLC was acquired by a McKesson entity in 2015. Elliott was employed by RxCrossroads 3PL LLC prior to that acquisition.

5

20. Simply put, Elliott was privy to, and helped develop, the confidential information that allows McKesson 3PL's plasma distribution business to succeed, and that would be invaluable in the hands of a competitor.

*Elliott's Contractual Obligations*

21. Beginning several years ago, McKesson 3PL began to lose a number of highly-trained employees to Defendant BPL BPL is a direct competitor of McKesson 3PL in the distribution and transfer of plasma and plasma-derived products.

22. BPL is based in Louisville, Kentucky with its main warehouse in or near Louisville, Kentucky.

23. At the same time that BPL hired multiple employees from the McKesson 3PL business in 2023, BPL also sought to hire Elliott to join them at BPL.

24. In response to Elliott reporting that he was being solicited by BPL, McKesson 3PL presented Elliott with the opportunity for a promotion and significantly enhanced compensation if he would remain with McKesson 3PL. McKesson 3PL's offer of a promotion enhanced compensation, which Elliott accepted, was also conditioned upon Elliott agreeing to the terms of a Business Asset Protection Agreement ("the Agreement"). A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

25. The Agreement states that it is between McKesson Corporation and each one of its its "affiliates, subsidiaries, successors and/or assigns," on the one hand, and Elliott on the other. (**Ex. A** at p. 1).

26. The Agreement contains a number of restrictions on Elliott's activities both during and after his employment with McKesson 3PL. For example, with regard to confidential information, Elliott agreed:

6

> "I will not, during and after my employment with the Company, directly or indirectly disclose or distribute to any person or entity, or use, except for the sole benefit of the Company, any of the Company's Confidential Information or Trade Secrets (Confidential Information and Trade Secrets together constitute "Company Information"). "Confidential Information" means any information or material not generally known to the public, and which (a) is generated or collected by or used in the operations of the Company and relates to the actual or anticipated business of the Company or the Company's actual or prospective vendors or clients; or (b) is suggested by, or results from any task assigned to me by the Company or work performed by me for or on behalf of the Company or any client of the Company."

(*Id.*, § 1).

27. With regard to his work for a competitor of McKesson 3PL, Elliott also agreed:

> "During my employment with the Company, and for twelve (12) months thereafter, so long as the Company (and/or its successors or assigns) carries on a like business, I will not directly or indirectly, on behalf of myself or in conjunction with any other person, company or entity, own (other than less than 5% ownership in a publicly traded company), manage, operate, or participate in the ownership, management, operation, or control of, or be employed by any entity which is in competition with the Company, with which I would hold a position with responsibilities similar to any position I held with the Company during the eighteen (18) months preceding the termination of my employment with the Company or in which I would have responsibility for and access to Confidential Information similar or relevant to that which I had access to during the eighteen (18) months preceding the termination of my employment with the Company, in any geographic territory over which I had material responsibilities, or if I did not have material responsibilities over a geographic territory, where I provided services or products during the eighteen (18) months preceding the termination of my employment with the Company."

(*Id.*, § 5(b)).

28. Elliott also agreed not to solicit those McKesson 3PL customers or employees with whom he had worked, again for the same 12-month post-employment period. (*Id.*, § 5(a) and (c).)

29. Finally, Elliott agreed that the breach or even the threatened breach of any restriction in the Agreement would cause irreparable injury, entitling McKesson 3PL to injunctive relief:

> "In the event of a breach or a threatened breach of this Agreement by me, I acknowledge that the Company will face irreparable injury which may be difficult

7

> to calculate in dollar terms and that the Company will be entitled, in addition to remedies otherwise available at law or in equity, to temporary restraining orders and preliminary and permanent or final injunctions without the posting of a bond enjoining such breach or threatened breach."

(*Id.* at § 12).

30. Lastly, Elliott agreed that the laws of the State of his residence, Kentucky, would govern the Agreement, and that if McKesson 3PL were forced to bring suit to enforce the restrictions in the Agreement and succeeded in doing so, the company would be entitled to its reasonable attorneys' fees and costs. (*Id.*)

### *Elliott Notifies McKesson 3PL of his Resignation*

31. On or about December 31, 2024, Elliott notified McKesson 3PL that he was considering a job opportunity at BPL leading its blood plasma business. At that time, McKesson 3PL reminded Elliott of the non-compete provision in the Agreement, and stated that McKesson 3PL would consider him working for BPL to be a breach of that Agreement.

32. McKesson 3PL's position was and is based on the fact that BPL is a direct competitor in the same plasma business that Elliott led at McKesson 3PL, and operates in the exact same geographic market that Elliott oversaw for McKesson 3PL. Simply put, Elliott was privy to all of McKesson 3PL's confidential information that would allow a competitor like BPL to undercut McKesson 3PL's pricing or trade off of the detailed vendor network that McKesson 3PL had developed under Elliott's leadership.

33. Despite that, on February 11, 2025, Elliott notified McKesson 3PL that he was resigning and intended to take a job with BPL. When he submitted his notice, McKesson 3PL representatives again informed Elliott that McKesson 3PL considered him working for BPL to be

a direct violation of the Agreement. Elliott indicated that his last day at McKesson 3PL would be February 21, 2025, and that he would start at BPL shortly thereafter.

34. On February 14, 2025, a McKesson 3PL representative met with Elliott to collect his company-owned electronic devices. During that meeting, the McKesson 3PL representative handed Elliott a letter, a true and correct copy of which is attached hereto as **Exhibit B**. In the letter, McKesson reminded Elliott of the provisions of the Agreement, explained again that it considered his employment at BPL in its blood plasma delivery business to be a violation of the Agreement, and asked for his assurance that he would abide by the Agreement.

35. Elliott did not respond to that letter.

36. The same day that it delivered the letter to Elliott, McKesson also sent a letter to BPL, a true and correct copy of which is attached hereto as **Exhibit C** to BPL. In the letter to BPL, McKesson 3PL included a copy of Elliott's Agreement, explained that it viewed his employment at BPL as a direct violation of that Agreement, and asked BPL to explain how Elliott's employment at BPL would be anything other than a direct violation of the Agreement. McKesson 3PL's letter cautioned BPL that if McKesson 3PL did not receive assurances by February 19th that Elliott would not be allowed to breach the Agreement, then it would pursue legal action.

37. On February 18, 2025, McKesson 3PL received a letter from BPL, a true and correct copy of which is attached hereto as **Exhibit D**. In its response, BPL merely stated that it was considering the matter and would respond after consulting with its counsel.

38. When no further response was received, McKesson 3PL sent another letter to BPL, a true and correct copy of which is attached hereto as **Exhibit E**. In its follow up letter, McKesson 3PL again asked for a substantive response and warned that if BPL followed through with hiring

9

Elliott, McKesson 3PL would seek legal recourse. As of the filing of this Complaint, no further response from BPL was received.

39.     Elliott's last day at McKesson 3PL was February 21, 2025. On that day, McKesson 3PL asked Elliott to confirm his start date at BPL. Elliott replied that he did not think he should talk to the McKesson 3PL representative, and refused to disclose his start date at BPL.

*Effect of the Defendants' Conduct*

40.     As the leader of the sole plasma distribution center for McKesson 3PL, Elliott had access to all of the confidential information that allows that business to succeed.

41.     If Elliott goes to work for a competitor like BPL, then all of McKesson 3PL's confidential information is placed at risk. If Elliott and BPL use McKesson 3PL's confidential and trade secret information against it, McKesson 3PL stands to lose substantial and unquantifiable business revenue, as well as losing the value of its goodwill, customer relationships, trade secrets, and confidential and proprietary information, which cannot be adequately addressed at law.

42.     All told, Elliott and BPL are threatening and will continue to threaten significant irreparable harm to McKesson 3PL, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer and vendor relationships, loss of goodwill, as well as damage to McKesson 3PL's reputation as an industry leader and its ability to successfully market its services. The customer and vendor relationships that are threatened if Elliott joins BPL are worth millions of dollars to McKesson 3PL.

## COUNT I – BREACH OF CONTRACT
### (TODD ELLIOTT)

43. Plaintiff repeats and realleges paragraphs 1 through 43 hereof, as if fully set forth herein.

44. The Agreement that Elliott entered into is a valid and enforceable contract. Elliott received a significant compensation enhancement specifically conditioned upon his agreement to that contract and all the terms contained therein.

45. Plaintiff has performed all of the material obligations required of it under the Agreement.

46. Elliott has breached and/or is threatening to breach the Agreement by accepting a role at BPL in its same blood plasma distribution business. That role is directly competitive with the role that Elliott fulfilled most recently at McKesson 3PL, overseeing the same business in the same geographic area.

47. Elliott's breach and threatened breach of the Agreement are causing and will continue to cause irreparable harm to Plaintiff by placing its confidential information, trade secrets, and goodwill with customers and vendors at risk. This is exactly what McKesson 3PL sought to avoid, and what Elliott agreed not to do, when they entered into the Agreement.

48. Despite numerous opportunities to explain how his role at BPL would be anything other than a violation of the Agreement, Elliott has refused to provide such information or even indicate when he would officially start at BPL.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT
### (BPL)

49. Plaintiff repeats and realleges paragraphs 1 through 49 hereof, as if fully set forth herein.

50. The Agreement that Elliott entered into is a valid and enforceable contract. Elliott received a significant compensation enhancement specifically conditioned upon his agreement to that contract and all the terms contained therein.

51. Plaintiff has performed all of the material obligations required of it under the Agreement.

52. BPL is aware of the Agreement and the restrictions contained therein. To the extent that BPL was not aware of those obligations when it offered a position to Elliott, it was at least aware of them when McKesson 3PL informed BPL of those restrictions on February 14, 2025.

53. Despite its knowledge of those restrictions, BPL is offering and incentivizing Elliott to breach the Agreement by accepting a directly competitive role at BPL, competing against McKesson 3PL in the same business he oversaw.

54. BPL's actions are causing and will continue to cause irreparable harm to Plaintiff by placing its confidential information, trade secrets, and goodwill with customers and vendors at risk. This is exactly what McKesson 3PL sought to avoid, and what Elliott agreed not to do, when they entered into the Agreement.

55. Despite numerous opportunities to explain how Elliott's role at BPL would be anything other than a violation of the Agreement, and despite numerous warnings that it would face legal action if it went ahead with hiring Elliott, BPL has refused to provide such information.

## **PRAYER**

WHEREFORE, Plaintiff prays for the Court to enter judgment in its favor and against Defendants, and awarding Plaintiff:

A. Emergency, preliminary, and permanent injunctive relief against Defendants (i) prohibiting Defendant Elliott from accepting a competing role at BPL during the

restricted period in the Agreement; (ii) prohibiting Defendant BPL from hiring or employing Elliott in a competing role at BPL during the restricted period in the Agreement; and (iii) prohibiting Defendants from breaching or tortiously interfering with any other provision of the Agreement:

B. Damages to be proven at trial;

C. Costs of this suit;

D. Reasonable attorney's fees pursuant to the Agreement; and

E. Such other and further relief as the court deems just and proper;

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

/s/ *Michael C. Merrick*

Kevin J. Mahoney (*pro hac vice* pending)
SEYFARTH SHAW LLP
233 S. Wacker Dr., Suite 8000
Chicago, Illinois 60606-6448
Tel: (312) 460-5737
kmahoney@seyfarth.com

Michael C. Merrick
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, 4th Floor
Louisville, Kentucky 40202
Tel: (502) 416-1630
mmerrick@kaplanjohnsonlaw.com

*Attorneys for Plaintiff*